[Civ. No. 10836.    Third Dist.    Sept. 29, 1964.]

MARION BARTON, Plaintiff and Appellant, v. WILLIAM H. BARTON, Defendant and Respondent.

44

Elizabeth Inglis Hummel for Plaintiff and Appellant.

Gray & Thurn and Charles F. Gray, Jr., for Defendant and Respondent.

PIERCE, P. J.—Plaintiff wife sued for separate maintenance and defendant husband cross-complained for a divorce upon the ground of extreme cruelty. Both sought custody of a minor daughter. The trial court found that the husband had been guilty of adultery as alleged in the wife's complaint and a decree of separate maintenance was made with an alimony award. It found that the wife had been guilty of extreme cruelty and a divorce was granted to the husband. Custody of the minor child was awarded to the husband. The community property was divided.

The wife appeals from the divorce decree and the child custody award. The alimony award and property division are unchallenged. The husband does not appeal. The grounds of the wife's appeal are (1) the court's lack of power to award the husband a divorce after a contemporaneous finding of the husband's adultery and a decree of separate maintenance with alimony to the wife; (2) insufficiency of the evidence to sup-

port the court's finding of the wife's extreme cruelty; and (3) insufficiency of the evidence to support the court's order awarding custody of the daughter to the husband. We disallow all contentions and affirm the judgment.

■ We consider first the argument that there can be no coexistence between a decree of separate maintenance awarding alimony to the wife and a decree granting a divorce to the husband. In *Lampson* v. *Lampson,* 171 Cal. 332, 333 [153 P. 238], it was held that ''Where a divorce is granted to the husband for the fault of the wife *and nothing further appears concerning the circumstances, as is the case here,* the court has no power to allow permanent alimony to the wife.'' (Italics added.) In *In re McKenna,* 116 Cal.App. 232, which followed the *Lampson* case, the court made the statement at page 233 [2 P.2d 429]: ''. . . The court was without jurisdiction to grant permanent support to the wife by reason of the fact that the divorce was not granted to her, but was granted to her husband for her fault, . . .'' This court in 1961, speaking through Presiding Justice Van Dyke, in *Salvato* v. *Salvato,* 195 Cal.App.2d 869, at page 871 [16 Cal. Rptr. 263], stated that that language in *In re McKenna, supra,* was ''too broad.'' In *Salvato* the husband had contended that because he had been awarded a divorce for the wife's extreme cruelty an allowance by the trial court of alimony to the wife on her cross-complaint for separate maintenance upon a finding that ''plaintiff had been guilty of extreme cruelty toward defendant, as alleged in her cross complaint for Separate Maintenance in the action,''[1] exceeded the court's powers. Disallowing this contention, this court stated on pages 871-872:

''. . . The action here was not a mere 'application for divorce.' Respondent, having, as the court found, a cause of action for divorce against appellant, elected, perhaps because of personal or religious scruples, to prove the facts in support of a cross-complaint for separate maintenance. This she had a statutory right to do. And this right should not be circumscribed and limited by slavish adherence to a rule obtaining in a simple action for divorce where the fault of the defendant alone is in issue. Had defendant sued for divorce the court could, and no doubt would, have granted a divorce to both parties in order to escape from the rule declared in *Lampson* and *McKenna* and do justice. . . .

---

[1] We quote from the record, Clerk's Transcript, page 48.

"We see no reason why, in line with the modern and enlightened policy evinced in such cases as *De Burgh* v. *De Burgh,* 39 Cal.2d 858 [250 P.2d 598], *Hull* v. *Superior Court,* 54 Cal.2d 139 [5 Cal.Rptr. 1, 352 P.2d 161], *Hudson* v. *Hudson, supra* [52 Cal.2d 735 (344 P.2d 295)], and others, it should not be declared in this case and on this record alimony could be granted to the wronged wife."

We see no reason to recede from our rule in the *Salvato* case. The only distinction between the facts there and here is that the husband seeks the benefit of the rule to sustain his divorce decree, whereas the wife in *Salvato* sought and received her alimony. This is an indistinguishable difference. Sauce for the goose is sauce for the gander.

The only case cited by appellant to support her position to the contrary is *Mattson* v. *Mattson,* 181 Cal. 44 [183 P. 443], but that case was expressly overruled by our Supreme Court in *De Burgh* v. *De Burgh,* 39 Cal.2d 858, 871 [250 P.2d 598], to the extent that it supported "a mechanical application of the doctrine of recrimination." In *De Burgh,* Justice Traynor, author of the majority opinion, studies "the history of the doctrine of recrimination, its objectives, and the wording and legislative background of the applicable statutes." (See p. 863.) No purpose will be served by repeating, even in outline, what is said therein. We do note and eschew attempt at embellishment of the following (pp. 863-864):

". . . The family is the basic unit of our society, the center of the personal affections that ennoble and enrich human life. It channels biological drives that might otherwise become socially destructive; it ensures the care and education of children in a stable environment; it establishes continuity from one generation to another; it nurtures and develops the individual initiative that distinguishes a free people. Since the family is the core of our society, the law seeks to foster and preserve marriage. But when a marriage has failed and the family has ceased to be a unit, the purposes of family life are no longer served and divorce will be permitted."

We approach the contention of appellant under the modern (*De Burgh*) interpretation of the California statutes on recrimination, Civil Code section 111, subdivision 4, and section 122, and with the above quoted precepts and principles in mind. Determination of this issue requires an examination of the facts. Resolving all factual conflicts, and giving all permissible inferences, in respondent's favor the record shows:

Marital difficulties between the parties began in 1956 when the husband returned from a convention. The wife locked herself in a bedroom and refused any communication with her husband for a week. At the end of this period in coventry, the two drove to Downieville to visit their daughter. There the wife accused the husband of neglecting her and their child and of subordinating his family life for his job. They returned home and the wife told her husband he was a complete failure as a husband and that she wanted a divorce. This wish was not acted upon but for four years thereafter the parties, although living in the same house, had no marital relations. In the summer of 1960 the husband asked the wife for a divorce. At first she agreed and then refused. In an effort to save the marriage, the parties agreed to resume marital relations. The husband was employed as a lobbyist, a vocation to which the wife objected. At one time, in 1961, when the husband arrived home in the evening, the wife unjustly accused him of having gone ''out on the town'' with a legislator's secretary.

However, thereafter the husband did become interested in another woman who ultimately, as the court found, became his mistress. In December 1961 the husband again asked for a divorce and the parties were separated for about two months. They again resumed joint occupation of living quarters but not marital relations. The wife at that time ascertained the identity of the other woman. She often used profane language toward her husband, told him he was immoral, unfit for his job, and threatened to have him discharged by his employer.

An official of the husband's employer testified as his witness at the trial. He told of a visit by the wife, the purpose of which was to urge that her husband be discharged. This witness also testified to the wife's complaints regarding her husband's conduct made to the association for which he worked and to various members. The husband's mother, also his witness, testified that for a period of 15 years she had not been welcome at her son's home and visits from her grandchild were forbidden.

The husband testified that his wife's conduct described above left him with a feeling that he was just existing. Her statements that he was a failure depressed him and lack of any ability of the two to communicate also bothered him.

Our examination of the record convinces us that here there was fault on both sides, that blame was approximately equal, and that it would have been a ''degradation of marriage and

a frustration of its purposes'' (to borrow the expression of Justice Traynor in *De Burgh* v. *De Burgh, supra,* 39 Cal.2d 858, 864) for the trial court to have left this marriage in existence by a denial to the husband of a divorce on the ground of extreme cruelty. The definition of extreme cruelty in Civil Code section 94 includes the ''wrongful infliction of grievous . . . mental suffering, upon the other by one party to the marriage.'' ▇ Whether such suffering has or has not been inflicted is a question of fact to be deduced from the circumstances of the case. It is to be determined in the light of the intelligence, refinement and delicacy of the sentiment of the plaintiff. (*Keener* v. *Keener,* 18 Cal.2d 445 [116 P.2d 1].) No precise legal test can be stated. Decision rests upon the good sense and judgment of the trial judge. (*Barnes* v. *Barnes,* 95 Cal. 171 [30 P. 298, 16 L.R.A. 660] ; *Keener* v. *Keener, supra.*) His conclusion is final unless the evidence is so slight as to indicate an abuse of discretion. (*McFall* v. *McFall,* 58 Cal.App.2d 208 [136 P.2d 580] ; *Johnson* v. *Johnson,* 214 Cal.App.2d 29 [29 Cal.Rptr. 179].) There was no abuse of discretion here either in the court's determination that this marriage was irretrievably wrecked, or in its determination that the wife's extreme cruelty, substantially equal to the husband's adulterous conduct and not altogether provoked thereby, was a cause thereof. ▇ Corroboration of the husband's testimony (which corroboration has been given above) was sufficient. ▇ The principal purpose of corroboration is to prevent collusion. (*Ruggles* v. *Ruggles,* 43 Cal. 2d 547 [275 P.2d 42].) ▇ And where it is clear from the evidence that there is no collusion—a fact quite apparent here —only slight corroboration suffices. (*Cardew* v. *Cardew,* 192 Cal.App.2d 502 [13 Cal.Rptr. 620].) Corroboration of a single act of cruelty has been held to be enough. (*Hayes* v. *Hayes,* 181 Cal.App.2d 634 [5 Cal.Rptr. 509] ; *Secondo* v. *Secondo,* 218 Cal. 453 [23 P.2d 752].)

▇ There was no abuse of discretion in the award of custody of the daughter to the husband. The 18-year-old child (at the time of trial—now 19 years of age) had expressed a preference that such custody be granted. At the time of the trial she was not living with either parent but with her paternal uncle and grandmother, James Barton and Bessie Barton, admittedly a suitable home. At that time (July 1963) the daughter planned to attend Sacramento City College in the fall and the father had leased a two-bedroom duplex 6 blocks from the school where she could live and

where he could be with his daughter in the evenings and on weekends. When he was away arrangements for adult supervision in his absence had been made. She had left her mother's home under circumstances strongly suggesting an unadjustable incompatibility between the two. Actual departure from the mother's home had occurred when the mother "had told her to move out of the house and to go live with her father." It also appeared that the mother had habitually dwelt upon her marital difficulties, had on many occasions denounced the husband, telling the daughter her father was "no good"; that the mother listened to her daughter's telephone calls with her friends toward whom the mother was so unfriendly that the daughter hesitated to bring them into the home. (The daughter admitted, however, that she knew her mother loved her. Also admitted was the fact that she had had an emotional problem, a cause of justifiable concern on the part of her mother, for which disciplinary control would have been indicated.) It appeared in evidence that no interference would be placed in the way of visits between mother and daughter as often as the former might desire. It did not appear that the father's love affair would entail any contacts between the daughter and the mistress.

The foregoing facts would justify the court's having selected the father as the proper parent to have custody of the daughter. To them may be added other considerations: There is an all-things-being-equal statutory preference given to the father of a child of an age to require education (Civ. Code, § 138). Moreover, there are practical difficulties involved in placing court-coerced restraints upon adolescents who have so nearly reached legal maturity. (Many 19-year-old girls have married, started to raise families, become homemakers.) Particularly is this true of a college student who is already emancipated from parental control in many respects. We can find in the court's selection nothing but the exercise of a sound judicial discretion motivated by the child's best interests.

The judgment is affirmed.

Friedman, J., and Moor, J. pro tem.,* concurred.

A petition for a rehearing was denied October 22, 1964, and appellant's petition for a hearing by the Supreme Court was denied November 25, 1964.

*Assigned by Chairman of Judicial Council.